## Local 63, Textile Workers Union of America, C.I.O. *v*. Cheney Brothers

Superior Court      Hartford County      File No. 94585

Memorandum filed April 13, 1953.

*Ribicoff, Ribicoff & Kotkin,* of Hartford, for the Plaintiff.

*Robinson, Robinson & Cole,* of Hartford, for the Defendant.

ALCORN, J. The plaintiff, hereinafter referred to as the union, brings this application to vacate an arbitration award pursuant to § 8161 (d) of the General Statutes, upon the ground that the arbitrator exceeded his powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter was not made. The defendant, hereinafter referred to as the company, in an answer and cross application seeks a correction of the award pursuant to § 8162 (c) of the General Statutes for imperfection of form. The parties are in accord that the award is not final and definite to adjudicate the questions submitted to the arbitrator and the issue is whether the defect is one of substance, requiring that the award be vacated, or a matter of form permitting its correction.

By amendment the union claims that the award is invalid for not having been made within the time required (General Statutes § 8159) and seeks, in addition to an order vacating the award, orders "that said award be declared to have no legal effect" and "that defendant be ordered to restore the rates of pay in effect for the period preceding January 5, 1953, as of January 5, 1953."

The union has represented the company's production and maintenance employees as bargaining agent since 1937. Effective March 26, 1951, the company, after negotiations with the union, granted a general wage increase approximating 9¾ cents per hour for about 1600 hourly and piece work employees. The

increase did not affect about twenty engravers. At the same time a cost-of-living escalator agreement was reached providing for a one cent quarterly wage adjustment for every 1.153 points change in the "U. S. Bureau of Labor Statistics Consumer Price Index for Moderate Income Families in Large Cities—Old Series."

Effective August 1, 1952, the union and the company entered into a written collective bargaining agreement superseding a similar previous agreement. The agreement, so far as now material, provided in § 5, concerning wages, that "The Company or the Union may reopen the question of basic rates of pay per unit of time or minimum wages, with intent to make changes. . . . Any difference which may arise with respect to the Company's action in these matters shall be handled in accordance with Section 12. (Adjustment of Grievances.)"

Section 9 provided for a cost-of-living allowance on the basis agreed upon in March, 1951, as already described. This section of the contract also provided that "Adjustments shall be made four times a year, either upward or downward, effective the first Monday in July, October, January and April based upon the Index for May, August, November and February respectively."

Section 12 of the contract provided for the adjustment of grievances by arbitration.

At a meeting between the union and the company on September 17, 1952, the company proposed a wage reduction to offset the increase which had been granted in March, 1951, and a revision of the cost-of-living clause of the contract. The union refused to agree and the company requested the union to join in arbitration under the contract. The union again did not agree and on October 10, 1952, the company, as per-

mitted by the contract, submitted to the American Arbitration Association the following request for arbitration.

"On September 17, 1952, the Company asked the Union to agree to the following modifications in the Company's basic rates of pay per unit of time:

"1. A direct wage decrease of $9\frac{3}{4}$ cents per hour for all employees covered by the current agreement, to offset the wage increase which became effective on March 26, 1952.

"2. Revision of our cost-of-living formula (Section 9 of the current agreement) by providing for adjustment upon each change of 1.32 points in the applicable index, instead of 1.153 points."

The parties agree that the date March 26, 1952, referred to is an error and was intended to be March 26, 1951.

Thereafter the American Arbitration Association, which serves only as a medium for the selection of arbitrators, took its usual steps to provide an arbitrator, and on November 13, 1952, an arbitrator was selected and accepted his appointment. Thereafter the arbitrator held hearings at the company's offices on November 25 and 26, 1952, at which both parties appeared and were heard and the company, but not the union, was represented by counsel. By agreement of the parties the time within which the arbitrator might, under the arbitration rules, make his award was extended from December 26, 1952, to January 6, 1953. On December 31, 1952, the arbitrator made his award in the following terms:

"1. Beginning with the first payroll period which commences after December 31, 1952, all hourly rates and base rates shall be reduced by 9.75 cents. Piece rates and plant hiring minimum rates shall be adjusted accordingly.

"2. Beginning with the first payroll period which commences after December 31, 1952, Section 9 of the collective bargaining agreement between the parties dated August 1, 1952 shall be modified so as to provide for a 1 cent cost-of-living adjustment for every 1.32 index points' change in the U. S. Bureau of Labor Statistics Consumers' Price Index for Moderate Income Families in Large Cities, Old Series. The February 1951 Index of 184.2 shall continue to be used as the starting point in calculating changes in the cost of living. The effect of this will be to reduce the Cost-of-Living Allowance payable for the current quarter from 7 cents to 6 cents per hour."

Thereafter the representatives of the union and the company met to discuss the steps necessary to carry out the award. The discussion indicated uncertainty in the minds of both parties as to the meaning of the award. The company has never sought to take advantage of any lack of clarity and has, throughout, insisted that the award is to be understood to give it no more relief than it sought in the discussions with the union prior to the arbitration and in the questions submitted to the arbitrator. On the other hand, the award, by its terms, directs a reduction in wages in some cases below the level of March 26, 1951, which was in issue.

With the award the arbitrator simultaneously filed a lengthy opinion setting forth his reasons. The rules of the arbitration designated by the contract permitted but did not require this procedure. The company takes the position that the opinion forms a part of the award. *Schoolnick* v. *Finman,* 108 Conn. 478, 481. It seems clear, however, that the arbitrator, under the permitted procedure, and in view of the form of the award, intended the award to be the document designated as such which contained the decision already quoted, and that he filed the opinion as a separate explanatory document. "The award

must of course contain that actual decision of the arbitrators which is the result of their consideration of the various matters submitted to them. But it need contain nothing else. The means by which they have come to this conclusion, the reasoning or the principles on which they base it are, unless the submission otherwise requires, needless and superfluous." *In re Curtis-Castel Arbitration,* 64 Conn. 501, 513.

The evidence shows that, in the case of piece workers, an intricate mathematical computation was used to effectuate the March 26, 1951, increase, designed to provide a schedule by which piece workers as well as hourly employees would receive approximately the same rate of increase. The company's object in the arbitration was to invoke the same process to eliminate the increase. An examination of the arbitrator's opinion indicates that he intended by paragraph (1) of the award only to eliminate the March increase. The lack of clarity arises from the fact that, as the parties agree, the phraseology of the award would permit a more extensive reduction.

As was said in *United States Time Corporation* v. *Waterbury Watch Workers Union,* 15 Conn. Sup. 391, 395, "In any event, it is the award, not the finding and conclusion of fact, which controls, and the award cannot be found to be indefinite because of some apparent inconsistency between it and the finding of facts." The difficulty here arises from the use of the terms "hourly rates," "base rates," "piece rates" and "plant hiring minimum rates" in the award. The company uses similar as well as other terms in its wage structure. The meaning given to like or similar terms by the company was not explained to the arbitrator, however. The formula by which the company computed the March, 1951, increase was not explained to the arbitrator. The terms used in the award cannot, therefore, relate to the company's method of calculating the increase.

In the computations to arrive at the March, 1951, increase the company had increased what it called its "hiring rate" six cents per hour. It had increased what it called its "minimum rate" five cents an hour. It had increased its hourly workers nine and three-quarter cents an hour. The numerous piecework operations involved various "base rates." There are some 140 piecework operations and many thousand "piece rates." A computation was made for each piecework operation and the result was applied to each "piece rate." The company had increased "base rates" for piece workers by a computation designed to produce an average increase of 8.1 cents. This did not, however, represent an actual increase of that amount in each "base rate." Finally, the overall increase described as 9¾ cents represented only an approximated average for all employees involved. In actuality some employees conceivably received more or less than that increase.

The first question submitted to the arbitrator, therefore, contained a confusing contradiction in terms. "A direct wage decrease of 9¾ cents per hour" was not, due to the calculations involved, necessarily the same for all employees as a wage decrease "to offset the wage increase which became effective on March 26, 19[51]."

"The use of arbitration should be encouraged. It is true that the beneficial results of the procedure can be realized only when the agreement to arbitrate is drafted with care to comply with legal requirements. The same may be said of the submission. It should state the specific question to be decided with definiteness and it should be of such a nature that the award which follows will answer the question with exactitude. In this manner, a judgment of the court entered thereon will be an enforceable and binding judgment. When these requirements are met, arbitration deserves the enthusiastic support of the courts." *Inter-*

*national Brotherhood of Teamsters* v. *Shapiro,* 138 Conn. 57, 68.

This submission would have been more accurate if the question had been confined to offsetting the increase which had become effective, and had omitted reference to a "direct wage decrease of 9¾ cents per hour."

The award in turn is not a final and definite answer to the real question at issue when it directs that "all hourly rates and base rates shall be reduced by 9.75 cents. Piece rates and plant hiring minimum rates shall be adjusted accordingly."

The arbitrator's opinion indicates that the form and presentation of the submission led him to consider the proposition presented as primarily "a direct wage decrease of 9¾ cents per hour." He considered it from the standpoint of the general course of wage adjustments previously reached by the parties, and of those prevailing in similar plants elsewhere. He arrived at the basic conclusion that wages should revert to the March, 1951, level. Lacking information, however, as to how that level had been increased, his award is not phrased to eliminate that increase.

The situation thus created is more than procedural. A correction could be made if it did not affect the merits of the controversy. General Statutes, § 8162. But the court has no power to make a correction which does affect the merits of the controversy. *Pratt, Read & Co.* v. *United Furniture Workers,* 136 Conn. 205, 208. Any correction of this award which would adapt it to the company's wage formula would materially alter the arbitrator's conclusion in a substantive way. The court cannot thus substitute its independent judgment in place of a judgment on the **award.**

The award upon the first point is not mutual, final and definite upon the subject matter. There remains for consideration the award upon the second point, namely, the cost-of-living allowance.

The contract between the parties treats of wages in § 5 as an item separate and distinct from the cost-of-living allowance, which is the subject of § 9. Section 5 concerning wages, as already indicated, provides for reopening and arbitration. Section 9, concerning the cost-of-living allowance contains no provision for reopening or reconsideration. Section 15 of the agreement, however, provides that "If during the life of this Agreement and not at a termination date, either party desires to modify this Agreement, such party shall give the other party written notice of such desire sixty days prior to the date of such proposed modification."

It is not necessary to consider whether, if proper steps were taken under this section to modify § 9 of the agreement, such modification would be a subject for arbitration under § 12. The company claims here that the so-called "escalator" clause was arbitrable as a wage item subject to reopening as such. It was submitted to the arbitrator as a modification "in the Company's basic rates of pay per unit of time."

Without discussing the merits of that claim it is sufficient to consider only the terms of the award as applied to the question submitted. The only revision sought was a change in the points of the applicable index from 1.153 to 1.32. If the award had confined itself to that narrow issue then the language of the contract, § 9, quoted above, would govern the time when the adjustment should be made and upon what index. The award as made, however, specifies that the index point change shall be effective "[b]eginning with the first payroll period which commences after December 31, 1952" and concludes "The effect

of this will be to reduce the Cost-of-Living Allowance payable for the current quarter from 7 cents to 6 cents per hour." In so deciding the arbitrator went beyond the scope of the submission and by so doing exceeded his powers. *Pratt, Read & Co.* v. *United Furniture Workers,* supra.

The claim that the award was not timely is without merit. General Statutes § 8159. That statute is directory rather than mandatory. *International Brotherhood of Teamsters* v. *Shapiro,* supra. Furthermore, the submission was on November 13, 1952, the award was made on December 31, 1952, and within a period agreed to by the parties.

An order may enter vacating the award.